UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KELLIE MICHELLE PITTMAN | *   CIVIL ACTION |
| | *   NO. 20-2579 |
| VERSUS | * |
| | *   MAGISTRATE JUDGE |
| KILOLO KIJAKAZI, COMMISSIONER | *   JANIS VAN MEERVELD |
| OF THE SOCIAL SECURITY | * |
| ADMINISTRATION | * |
| | * |
| ************************************ | * |

ORDER AND REASONS

The plaintiff, Kellie Michelle Pittman, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Act, 42 U.S.C. §§ 423, 1381. She argues that the Administrative Law Judge's assessment of Ms. Pittman's residual functional capacity is not supported by substantial evidence because the only medical opinion as to her residual functional capacity was found unpersuasive. The matter has been fully briefed on cross-motions for summary judgment. Because the lack of a medical opinion on residual functional capacity is not fatal and because the undersigned finds that the Administrative Law Judge's assessment of Ms. Pittman's residual functional capacity is supported by substantial evidence, IT IS ORDERED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 22) is DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 26) is GRANTED.

**Procedural Background**

Ms. Pittman applied for DIB and SSI on or about June 22, 2018,[1] asserting a disability onset date of April 26, 2018. She alleged the following illnesses, injuries, or conditions: back problem, knee problem, shoulder problem, PTSD, herniated disc, leg problem, and sleep disorder. It appears that Ms. Pittman had retained counsel on or about June 4, 2018, prior to filing her claim for benefits.[2] On or about December 5, 2018,[3] her claim was denied by the state agency.

Ms. Pittman requested a hearing before an Administrative Law Judge ("ALJ"), which was held on January 16, 2020.[4] On February 27, 2020, the ALJ issued an adverse decision. Ms. Pittman timely appealed to the Appeals Council, which denied review on July 20, 2020.

On September 23, 2020, Ms. Pittman filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 13, 16). The parties filed cross-motions for summary judgment. (Rec. Docs. 22, 26). Ms. Pittman is represented by counsel.

---

[1] The record reflects an application for SSI signed by Ms. Pittman on June 5, 2018, and stamped by the Social Security Administration ("SSA") on July 3, 2018, R. at 218-26, as well as another application for SSI signed by Ms. Pittman on March 4, 2019, stamped by the SSA on March 22, 2019, and referencing a filing date of June 22, 2018. R. at 244-52. In a letter documenting a June 25, 2018, telephone conversation between Ms. Pittman and staff for the Social Security Administration, it is noted that if Ms. Pittman's signed application was received by December 22, 2018, the SSA would use June 22, 2018, as the filing date. R. at 213. The letter does not specify whether it concerns Ms. Pittman's DIB claim, her SSI claim, or both. However, another letter dated the same day and summarizing Ms. Pittman's statements concerning her alleged disabilities during the telephone call indicates that Ms. Pittman was applying for DIB and/or SSI. R. at 215. The sole disability determination transmittal and explanation in the record pertains to Ms. Pittman's claim for DIB and references a filing date of June 22, 2018. R. at 94.
[2] R. at 108.
[3] A letter dated December 5, 2018 from the SSA notifies Ms. Pittman that her claim for benefits was denied. R. at 109. The disability determination and transmittal states that benefits were denied on December 4, 2018. R. at 94.
[4] As noted by the ALJ in his opinion, the hearing was originally scheduled for September 6, 2019, but was rescheduled to January 16, 2020, because Ms. Pittman's counsel was unable to participate in person on the original date due to illness.

**Evidence in the Record**

*Hearing Testimony*

Ms. Pittman finished high school through the 12th grade and served 10 years in the military until 2015. R. at 70. After that she worked as a phlebotomist, but quit because of her back. R. at 71. She described the work as "a lot of 12 hour on your feet kind of work." Id. She decided to try a desk job and began working at Bryan Chevrolet. Id.  She also stopped that work because of her back. R. at 72. She explained that she was having back pain from sitting all day and had to leave to go home, and that is when she went to the Emergency Room for an MRI. Id. She also worked at O'Reilly Automotive delivering auto parts. Id.  However, she testified that her back went out on her due to the lifting requirements. Id.

Ms. Pittman testified that her back pain began in late 2007 or early 2008 when she came back from basic training and advanced individual training with the military. R. at 75. After she was discharged from the military and returned home, she began treating with Neuromuscular Medical Associates, and continued treating there about every two months through the time of the hearing. R. at 75-76. She reported that they did not want to proceed to surgery just yet because they were worried about her winding up in a wheelchair. R. at 76. She said she had been taking strong medication and they were "just trying to keep an eye on it right now." Id.  She was not doing any kind of physical therapy because she had tried it when living in Texas in 2008 but it caused her more pain. R. at 77, 84. Ms. Pittman testified that she does not have injections because she cannot afford them. R. at 78. She testified that she had an injection once and it relieved her pain for about a month, but then the pain returned. R. at 79.

Ms. Pittman lives with her husband. R. at 79. He does the cooking and cleaning. R. at 80. Ms. Pittman explained that even going to the sink to fill the coffee pot with water hurts her. Id.

Her husband helps her get up and sit down or helps her walk through the house. R. at 81. Sometimes she goes with him to the grocery store to pick out some items, but she may have to leave or have to stop and bend over to relieve the pain. R. at 82. The ALJ asked whether her treating physician had given her any functional limitations. R. at 78. Ms. Pittman responded that "[p]retty much they said just do what you can . . . ." Id.

Ms. Pittman testified that if she tries to lift ten pounds it is very painful. R. at 78. She said that when walking from the parking lot across the street to the location of the hearing, she had to stop halfway because her back started hurting badly. R. at 79. She cannot sit very long. Id. She can only stand for about 15 seconds. R. at 81. She testified that once she used a cane for about a week or so to get around the house. R. at 81. When standing or walking, sometimes she has to bend over to relieve the pain. R. at 81-82. She avoids driving because it aggravates her back. R. at 83. She is constantly shifting sleeping positions. R. at 82.

Ms. Pittman testified that her condition has gotten worse over time. R. at 85. She testified that on a scale of one to ten, with ten meaning that she needs to go the hospital to seek treatment, her pain usually stays at a ten. R. at 84. But she said she cannot run back and forth to the hospital so she tries to take her medication and stay on the couch. Id.

At the hearing before the ALJ on January 16, 2020, Ms. Pittman's attorney directed the ALJ to an MRI performed on May 4, 2018, noting that she would rely entirely on that. R. at 69. Counsel argued that Ms. Pittman is unable to stand for more than two hours at a time and cannot lift more than 10-15 pounds. R. at 70. Counsel also argued that Ms. Pittman would need a number of breaks and absences that would not be tolerated in a competitive work environment. Id.

Vocational expert Kasey Suggs testified at the hearing. The vocational expert classified Ms. Pittman's past work as an auto parts driver, DOT 292.353-010, medium, SVP 3, semi-skilled;

4

phlebotomist, 079.364-022, light, SVP 3, semi-skilled; certified nurse's aide, 355.674-014, medium, SVP 4, semi-skilled; cashier, 211.462-010, light, SVP 2, unskilled; and refueller operator, 903.683-018, medium, SVP 3, semi-skilled. R. at 86-87.

The ALJ asked the vocational expert to consider a person limited to light work with the additional limitation of no ropes, ladders, or scaffolds; occasional ramps, stairs, balancing, stooping, kneeling, crouching, crawling; the avoidance of hazards like unprotected heights and dangerous moving machinery; and no driving of long distances. R. at 89. Such a person could perform Ms. Pittman's past work as a phlebotomist.[5] Id. However, if the person needed a sit-stand every 30 minutes option, the phlebotomist job would be eliminated. R. at 90. The vocational expert testified that such a person could perform other work such as cashier, DOT 211.467-030, light, SVP 2, unskilled, with 1,203,953, jobs available; information clerk, DOT 237.367-018, light, SVP 2, unskilled, with 91,826 jobs available; and general office clerk, DOT: 222.587-038, light, SVP 2, unskilled, with 218,501 jobs available. Id. The vocational expert testified that such a person could perform the listed jobs if they needed to use a cane for walking prolonged distances. R. at 90. However, if they needed a cane about one-third of the day, only the information clerk position would remain available. Id. The vocational expert further testified that anyone who would be off task for more than 10 percent of the workday due to pain would not be able to maintain full time work. R. at 91.

Ms. Pittman's counsel asked the vocational expert whether the listed jobs would remain available if the person had to alternate sitting, standing, and reclining every 30 minutes throughout the day. R. at 91-92. The vocational expert testified that if the person had to recline, they could not

---

[5] At first the vocational expert also testified that such a person could perform Ms. Pittman's past work as a cashier. R. at 87. However, it was then concluded that Ms. Pittman's past work as a cashier had not been long enough to qualify as past relevant work. R. at 89.

5

do full time work. R. at 92. She also testified that a person who was absent two days a month due to symptoms would not be able to maintain a full time job, nor would a person taking two extra 15 minute breaks outside of the normally scheduled breaks be able to maintain full time work. Id.

*Medical Records*

Ms. Pittman presented for treatment at Neuromuscular Medical Associates on August 19, 2013, complaining of chronic lower back pain that began to worsen in 2007. R. at 592. She reported her pain was exacerbated by prolonged sitting or standing. Id.  Her current regimen was hydrocodone 7.5/325 mg every 6 hours and trazadone 50 mg nightly. Id.  She reported fatigue and chills/sweats and joint stiffness. Id. She reported her pain was 6 on a 10 point scale. R. at 593. Upon examination of the lumbar spine, she had a negative straight leg raise and positive facet loading at L4-5/L5-S1. Id. Sacroiliac joint findings of 4/5 positive on the right were noted. Id. Sensory exam, reflexes, and motor system were normal bilaterally. Id.  Her gait was normal. Id. An MRI was ordered and reviewed with Ms. Pittman on August 28, 2013.[6] R. at 594, 589. At that time she reported that her pain relief medication helps and is adequate to improve quality of life and activities of daily living. R. at 589. She denied side effects from medication. Id. She was diagnosed with lumbosacral spondylosis without myelopathy. R. at 591.

Ms. Pittman continued to treat with Neuromuscular Medical Associates approximately every 2 months over the next few years. In January 2014, her hydrocodone-acetaminophen prescription was increased to 10/325 mg every 6 hours and was continued at that level until June 2016 when she was weaned to 1 to 2 tablets at nighttime as needed. R. at 534, 583.  At that time, it was noted that she was doing well overall and had an upcoming new job. R. at 534. Meanwhile her trazadone prescription was increased to one 300 mg tablet nightly in April 2015. R. at 561.

---

[6] Results of this MRI do not appear to be in the record.

During the three year period from August 2013 through June 2016, she frequently reported that her medication was adequate to improve activities of daily living and quality of life. Her examination findings were the same and she consistently exhibited a normal gait. Around September 2016, she was working 12 hour shifts and reported that her back pain waxed and waned and was worse after her shift. R. at 528. She noted that sitting down to rest makes it better. Id. She also reported her medication was adequate to improve her quality of life and activities of daily living. Id.

In December 2016, Ms. Pittman began exhibiting pain on flexion and extension during examination, though her gait was still normal. R. at 526. She reported increased lumbago and radiculopathy down to her knee and intermittently down her right lower leg. R. at 525. Her prescription for hydrocodone-acetaminophen and trazadone were continued at the same levels and a lumbar facet injection and lumbar dorsal medial branch block were ordered. R. at 527. She cancelled the injections because she lost her insurance coverage. R. at 519.

On February 8, 2017, Ms. Pittman reported her lower back pain continued to wax and wane and that it was worsened with physical activity and relieved by rest. R. at 519. She reported her activities of daily living, quality of life, and activity were reasonably stable and that her medication was adequate to improve her quality of life and activities of daily living. Id.

On April 11, 2017, Ms. Pittman presented to the Slidell Memorial Hospital complaining of an injury to her right knee that occurred after missing a step and twisting her knee at home that day. R. at 306, 309. She was negative for back injury and pain. R. at 306. Upon examination, she had no spinal tenderness, no costovertebral tenderness, and full range of motion in her back. R. at 307. She had pain, swelling, and tenderness in the right knee with decreased range of motion. Id.

X-rays of the knee were performed and showed no acute fracture, dislocation, or destructive osseous lesion. R. at 311. A splint was applied to the knee and crutches were given. R. at 307.

At her following visit with Neuromuscular Medical Associates in May 2017, Ms. Pittman reported her right sided low back pain was getting worse and that her medication was no longer addressing the pain. R. at 516. Her hydrocodone-acetaminophen prescription was increased to one 10/325 mg tablet every 8-12 hours as needed. R. at 518. Trazadone was continued at 300 mg nightly. Id. At her June 28, 2017, follow up appointment, Ms. Pittman reported that her medication was working well to control pain without side effects and that she was able to perform activities of daily living. R. at 512. Her medication was continued at the new levels. R. at 514.

Ms. Pittman presented to the Slidell Memorial Hospital on August 5, 2017 complaining of sore throat, fever, arthralgias, and myalgia. R. at 313. She was positive for body aches, fatigue, and malaise. Id. She reported neck pain with movement and swollen lymph nodes. Id. Upon examination, she had 5/5 motor strength in all extremities and a normal gait. R. at 314. She had no spinal or costovertebral tenderness and full range of motion in her back. Id. A CT scan of the neck was performed. R. at 327. Mild mucosal hyperemia of the tonsil glands and an otherwise normal CT of the neck was observed. R. at 326. She was diagnosed with tonsillitis, Group A strep pharyngitis. R. at 317. She was prescribed clindamycin, Norco 5, and Zofran. R. at 316.

Ms. Pittman continued to treat at Neuromuscular Medical Associates from August 2017 until at least November 2019. During that time, notes of examination were the same as they had been since December 2016 and she consistently demonstrated a normal gait. She reported that her back pain was worse in October 2017, but that her pain level decreased as the day progressed. R. at 366. Her medication was still helpful and well tolerated. Id. Between August 2017 and April 2018, she reported that the medication was working well and that she was able to perform her

activities of daily living, even on April 4, 2018 when she reported an increase in pain. R. at 495. Nonetheless, beginning around this time, Ms. Pittman's condition appears to have become worse.

Ms. Pittman presented to the Slidell Memorial Hospital on May 4, 2018, complaining of chronic pain that had been exacerbated that morning upon waking. R. at 331. She reported a history of chronic lower back pain secondary to a herniated disk with stiffness and pain elicited with bending and twisting. Id. She denied paresthesia, numbness, tingling, or weakness in the legs. Id. She reported decreased range of motion and pain with movement. Id. She described the pain as mild, but also rated the pain as 10/10. R. at 335. Her gait was steady on triage, but was later assessed as shuffling with difficulty ambulating. Id. Upon examination, she had full range of motion in the neck. R. at 332. Moderate pain in the lumbar area was noted, as well as pain with all movement. Id. Muscle spasm in the lumbar area was appreciated. Id. She had 5/5 motor strength in all extremities. Id. An MRI of the lumbar spine was performed. R. at 341. The following impressions were noted: Degenerative changes at L3-L4 with right extraforaminal component of the disc contacting right extraforaminal L3 spinal nerve; right subarticular L5-S1 disc protrusions compressing right S1 nerve root sheath; and focal bone marrow signal alteration about left anterior superior L4 endplate. Id. Ms. Pittman was discharged on steroids and with tramadol for pain and told to follow up in the clinic the following week. R. at 333. She was also prescribed Robaxin. R. at 334. She was told to return to the emergency department if her problems persisted or worsened. R. at 333.

At her May 30, 2018, appointment with Neuromuscular Medical Associates, Ms. Pittman reported severe pain to the lumbar area and that her medication was only minimally adequate to control pain. R. at 491. Her existing medication was continued, but Zanaflex 4mg as needed three times a day was also prescribed. R. at 493. On September 25, 2018, she reported increased lower

back pain and that she was hunched over when she walked. R. at 484. Nonetheless, her exam findings were the same and her gait was normal. R. at 485.

Again on December 4, 2018, Ms. Pittman reported severe increased lumbago and radiculopathy into her hips with constant pain. R. at 480. She reported she was unable to drive because of the pain and had a decreased functioning of life. Id. She reported morning stiffness and was positive for facet loading. Id. Her existing medications were continued and a ZTildo patch was prescribed. R. at 482. At her follow up visit on January 29, 2019, she reported the medicine regimen was only modestly controlling her pain. R. at 476. At her March 26, 2019, follow up appointment the ZTildo patch was discontinued because it was not helpful. R. at 475. She reported she was still working on getting insurance. R. at 473. She reported that the medicine regimen was working well and she denied side effects. Id. Her prescription for hydrocodone-acetaminophen was increased to every 6-8 hours. R. at 475. On May 21, 2019, she reported she continued to get by with her current medicine regimen. R. at 470. She reported that she was in the process of getting insurance but did not have it currently. Id. On July 7, 2019, she reported that her medication was working well to control pain without significant side effects and that she was able to more readily perform activities of daily living. R. at 705.

The state agency reviewing physician Dr. David Coffman reviewed and summarized Ms. Pittman's medical records from Slidell Memorial Hospital in 2018, her records from Neuromuscular Medical Associates in May and July 2018, and a function report filled out by her husband. R. at 97-98, 102. Dr. Coffman assessed Ms. Pittman's residual functional capacity as follows: she can occasionally lift and/or carry up to 20 pounds, can frequently lift and/or carry 10 pounds, can stand and/or walk for 6 hours in an 8 hour workday, and can sit for 6 hours in an 8 hour workday. R. at 101. Dr. Coffman further fond that Ms. Pittman can stoop occasionally but

has no limitation in her ability to climb ramps and stairs; climb ladders, ropes, and scaffolds; balance; kneel; crouch; or crawl. R. at 101-02.

## Decision of the Administrative Law Judge

Of relevance to the pending motions, the ALJ determined that Ms. Pittman's degenerative disc disease with spondylosis is a severe impairment. R. at 18. However, the ALJ determined that Ms. Pittman does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id.

The ALJ next determined that Ms. Pittman has the residual functional capacity to perform light work except no climbing ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; no work around hazards including moving machinery and unprotected heights; cannot drive long distances as part of the job; and must sit and stand every 30 minutes. Id. In coming to this conclusion, the ALJ determined that although the record showed complaints of low back pain, nothing in the evidence showed significantly limiting symptoms. R. at 21. The ALJ noted that Ms. Pittman's treating sources have not placed limitations on her activities that would support her allegations. Id. The ALJ further observed that her treating physicians had not recommended intense or aggressive forms of treatment or surgical intervention. Id. The ALJ determined that Ms. Pittman's treatment had been "essentially routine and conservative in nature." Id. The ALJ noted that Ms. Pittman "appears to have foregone medical treatment and chosen to treat only with pain management medication." Id. The ALJ was also influenced by the fact that the record did not contain any medical opinions indicating that Ms. Pittman "is disabled or even have limitations greater than those determined in this decision." Id. The ALJ considered the opinion of the state agency consultant Dr. Coffman,

but found his opinion was unsupported by medical evidence dated after the records Dr. Coffman had reviewed. R. at 22.

The ALJ next found that Ms. Pittman was unable to perform any past relevant work. R. at 22. The ALJ determined that Ms. Pittman was 48 years old on the alleged disability onset date, which classifies her as a "younger individual age 18-49." Id. The ALJ noted that Ms. Pittman subsequently changed category to "closely approaching advanced age." Id. The ALJ determined that Ms. Pittman has at least a high school education and is able to communicate in English. Id. Relying on the testimony of a vocational expert and considering Ms. Pittman's age, education, work experience, and residual functional capacity, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Ms. Pittman could perform. R. at 23. The ALJ concluded that Ms. Pittman has not been under a disability from April 26, 2018, through the date of decision. R. at 24.

## Statement of Issues on Appeal

Issue No. 1.   Whether the ALJ's residual functional capacity determination is supported by substantial evidence.

## Analysis

### I. Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v.

Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)).  This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II. **Entitlement to Benefits under the Act.**

To be considered disabled under the Act, a claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the

    claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id. An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

### III.    Plaintiff's Appeal.

Issue No. 1.    Whether the ALJ's residual functional capacity determination is supported by substantial evidence.

*a. Parties' Arguments*

Ms. Pittman argues that the ALJ's residual functional capacity ("RFC") determination is unsupported by substantial evidence because she relied upon her own lay opinion. To the extent the ALJ relies on the opinion of state agency non-examining physician Dr. Coffman, Ms. Pittman argues that doing so was improper because the ALJ found that opinion unpersuasive.[7] Ms. Pittman

---

[7] Ms. Pittman points out that the ALJ cited the former regulation for assessing opinion evidence on page 8 of the opinion where it states that Dr. Coffman's opinion "was considered in accordance with 20 CFR. 404.1527(e) and 20 CFR 416.927(e)"—the old regulations. R. at 22. However, as the Commissioner argues, this appears to be a scrivener's error. On page 5 of the ALJ's opinion, it states that "medical opinion(s) and prior administrative medical findings were considered in accordance with the requirements of 20 C.F.R. 404.1520c and 416.920c"—the new regulations. R. at 19. Moreover, after citing the wrong regulations on page 8, the ALJ nonetheless considered the supportability and consistency of Dr. Coffman's opinion, concluding that Dr. Coffman's opinion was "unsupported by the medical evidence." R. at 22. The new regulations provide that in evaluating a medical opinion, a series of factors are considered, the most important of which are supportability (i.e., relevant objective evidence and supporting explanations presented by the medical source) and consistency (i.e., consistency of the opinion or finding with evidence from other medical and nonmedical sources). 20 C.F.R. § 404.1520c(c)(1)-(2). Other factors are the relationship of the physician with the claimant, the length of the treatment relationship, the frequency of the examination, the purpose of the treatment relationship, the extent of the treatment relationship, whether there was an examining relationship, and the medical source's specialization. Id. § 404.1520c(c). The ALJ must explain how the supportability and consistency factors were considered, but is not required to explain how the other factors were considered. Id. § 404.1520c(b)(2). It does not appear that Ms. Pittman argues that the ALJ's opinion should be reversed solely because the wrong regulation was cited, and the court declines to do so here.

points out that Dr. Coffman only cited records up to July 30, 2018, in rendering his opinion. But the medical evidence of record includes subsequent treatment with Neuromuscular Medical Associates including a January 2019 visit when she reported pain of 10 on a 10-point scale. She argues that this later treatment shows a waxing and waning and worsening of her condition.

Ms. Pittman submits that the ALJ may have taken Dr. Coffman's opinion and added additional limitations, but she argues that the ALJ is not qualified to interpret raw data and simply split the difference.[8] Without Dr. Coffman's opinion, Ms. Pittman submits, there is a void in the record as to how the RFC was determined. In such a situation, Ms. Pittman argues, the ALJ should have developed the record by re-contacting medical sources and by ordering additional consultative examinations.

Ms. Pittman argues that this is not a case of a minimal impairment. She points out that the MRI of her lumbar spine showed degenerative changes at L3-L4 with right extraforaminal component of the disc contacting right extraforaminal L3 spinal nerve; right subarticular L5-S1 disc protrusion compressing right S1 nerve root sheath; and focal bone marrow signal alteration about left anterior superior L4 end plate that could be degenerative in nature or represent a recent Schmorl's node. Further, she testified that a desk job was too difficult for her to sit at because she cannot sit for very long and would have to lay down. She points out that the vocational expert testified that if someone had to recline at 30-minute intervals she would not be able to work.

---

[8] Ms. Pittman cites an Eastern District of North Carolina case where the court remanded the case to the Commissioner, observing that:
> It appears to the Court that the ALJ here simply performed a Solomonian splitting of the baby taking a non-examining physician's RFC of medium an examining doctors' RFC of sedentary or less than sedentary, discounting all of them, and arriving at an RFC of light. While this may appear to be a just result, it is not rooted in substantial evidence in the record and therefore fails.

Gibson v. Colvin, No. 7:13-cv-62, 2014 WL 4415969, at *2 (E.D.N.C. Sept. 8, 2014). But unlike in the present case, in Gibson there were two opinions of treating physicians that the court found should have been given controlling weight. Id. Here, there are no medical statements opining to a more restrictive RFC than found by the ALJ.

15

Ms. Pittman asks this court to reverse the decision of the ALJ and remand for further administrative proceedings.

The Commissioner opposes. She submits that in reaching her decision, the ALJ considered Ms. Pittman's "essentially routine and conservative" treatment and further that Ms. Pittman forwent medical treatment and chose only pain prescriptions to treat her alleged back pain. The Commissioner points out that Ms. Pittman told her providers that her medication worked well and kept pain to a tolerable level such that she could perform her regular activities. She opted out of physical therapy and was not interested in injection treatments. The Commissioner notes that although Ms. Pittman attributes the rejection of injection treatments to insurance loss, she did not resume injections once she had a new insurance plan in December 2018.[9]

The Commissioner insists that the record consistently shows that Ms. Pittman managed with medication. The Commissioner points to Ms. Pittman's report of moderate back pain, that she exhibited a normal gait despite alleging pain ranging from 3 to 10 on a 10-point scale, and that physicians at Neuromuscular Medical Associates consistently found her lumbar spine motor function normal bilaterally and a negative straight leg raise test. Citing 2017 records, the Commissioner notes that Ms. Pittman did not report back problems when she presented to the hospital for other issues. The Commissioner also points to Ms. Pittman's October 2017 treatment record where she reported her pain was worse in the morning and decreased as the day progressed and her February 2017 record where she reported her back pain was relieved by rest. The

---

[9] For the conclusion that Ms. Pittman had insurance in December 2018, the Commissioner appears to rely on a fax cover sheet from Slidell Memorial Hospital to Neuromuscular Medical Associates in December 2018 requesting authorization for an MRI that appears to be insurance related. R. at 658. Of note, though, there is no December 2018 or January 2019 MRI in the record and as noted in the summary of the medical records above, Ms. Pittman reported she was still working on insurance in March and May 2019. R. at 470, 473.

Commissioner insists that the ALJ considered Ms. Pittman's varied statements in assessing her RFC.

The Commissioner argues that there is no merit to Ms. Pittman's argument that the ALJ was playing doctor. She argues that it is the provenance of the ALJ to interpret the law and evidence to reach a determination as to whether an individual is disabled or unable to work. The Commissioner further argues that a diagnosis is not a functional limitation and that the mere presence of an impairment is not, per se disabling.

   b. *Law and Analysis*

The primary issue in this case is whether the ALJ's RFC finding is supported by substantial evidence in light of the fact that the ALJ found the only medical opinion that assessed Ms. Pittman's RFC to be unpersuasive. As the Commissioner points out:

> The absence of [a medical source] statement . . . does not, in itself, make the record incomplete. In a situation such as the present one, where no medical statement has been provided, our inquiry focuses upon whether the decision of the ALJ is supported by substantial evidence in the existing record.

Ripley v. Chater, 67 F.3d 552, 557 (5th Cir. 1995); see Joseph-Jack v. Barnhart, 80 F. App'x 317, 318 (5th Cir. 2003) ("We also reject Joseph–Jack's argument that because the record was devoid of a residual function capacity (RFC) assessment by a medical source, the ALJ was not competent to assess her RFC. It is the ALJ's responsibility to determine a claimant's RFC, and such an assessment is not a medical opinion."). Whether the ALJ's RFC is supported by substantial evidence requires a case specific inquiry.

For example, the Fifth Circuit Court of Appeals in Ripley held that the ALJ's RFC finding was not supported by substantial evidence because the record established that Ripley had "a problem with his back," but the record did "not clearly establish the effect Ripley's condition had on his ability to work. 67 F.3d at 557. Similarly, in Lagrone v. Colvin, the Northern District of

Texas found that the ALJ's RFC finding was not supported by substantial evidence where the ALJ had "rejected all medical opinions in the record that might explain the effects of LaGrone's physical impairments on his ability to perform work." No. 4:12-CV-792-Y, 2013 WL 6157164, at *6 (N.D. Tex. Nov. 22, 2013). The court observed, "[w]hile the ALJ may choose to reject these opinions, he cannot then independently decide the effects of Plaintiff's ... impairments on [his] ability to work, as that is expressly prohibited by Ripley." Id. (quoting Shugart v. Astrue, No. 3:12-CV-01705-BK, 2013 WL 991252, at *5 (N.D. Tex. Mar. 13, 2013) (alterations in original).

In contrast, the Western District of Texas in Myers v. Saul held that the ALJ's finding was supported by substantial evidence where the ALJ had rejected the only opinion in the record to assess the claimant's RFC. No. SA-20-CV-00445-XR, 2021 WL 4025993, at *8 (W.D. Tex. Sept. 3, 2021). The court explained:

> the ALJ did not find persuasive the administrative opinions that Myers could do light work and used other evidence in the record to impose a more restrictive RFC of sedentary work. The ALJ's RFC determination is more limited/favorable than the state agency medical consultants' opinions, and Plaintiff has not identified any medical opinions or objective medical evidence in the record that contradicts the ALJ's RFC finding. Further, the ALJ properly evaluated the medical opinion evidence, and he also noted all the symptoms identified by Dr. Bass in the statement and explained how he considered them in his analysis.

Id. Similarly, in an unpublished decision, the Fifth Circuit found the ALJ's RFC determination was supported by substantial evidence even though the ALJ had rejected the recommendation of the state agency reviewing physician and had not requested a more updated recommendation. Gutierrez v. Barnhart, No. 04-11025, 2005 WL 1994289, at *8 (5th Cir. Aug. 19, 2005). The court of appeals observed:

> In this case, the ALJ made adverse credibility determinations against Gutierrez based on at least six inconsistencies within her medical record and/or testimony. The ALJ also based the determination that she retained a residual functional capacity to perform at least her past relevant work as a Keno runner and/or laundry ticketer on several available pieces of evidence in the record, including her own

>    testimony that she was able to perform certain tasks despite having claimed serious shoulder impairment. Accordingly, we find no error.

Id. (footnote omitted).

Ms. Pittman criticizes the ALJ's RFC assessment because she says it merely adds additional limitations to the assessment of Dr. Coffman. While it appears that the ALJ may have done so, the ALJ was not "playing doctor" or "guessing" as Ms. Pittman suggests. The ALJ based the inclusion of additional limitations on Ms. Pittman's testimony about her limitations with regard to driving, walking, sitting, and standing. Yet the ALJ found that although Ms. Pittman's impairments could be expected to cause her symptoms, the medical records did not support the intensity, persistence, and limiting effect that Ms. Pittman claims. The ALJ considered the medical records, which showed that Ms. Pittman had increased complaints of pain beginning around April 2018, but that she nonetheless maintained a normal gait, negative straight leg test, and normal motor strength bilaterally. Indeed, by March 2019, she was again reporting that her pain medication was working well. The ALJ noted that no aggressive treatment or surgery had been recommended by her treating physicians and that Ms. Pittman had herself declined to pursue treatment beyond pain management medication. The ALJ also found that none of the treating physicians had placed limitations on Ms. Pittman's activities. All of the ALJ's assessments are supported by the medical records. And it was based on these records that ALJ concluded Ms. Pittman's limitations are not as severe as she claims, similar to the ALJ in Gutierrez that found the record was inconsistent with the claimant's allegations.

Further, as in Myers, Ms. Pittman cannot point to any contradictory medical opinions or medical evidence to support her alleged limitations. To support her contention that she would need to recline or lie down during the workday, Ms. Pittman can only point to her testimony that "[s]ometimes, if I can't sit very long, I'll try to lay down. Try to stand up and then I'm back to

19

sitting again." R. at 79. None of her physicians' recommendations or even her subjective reports to her physicians support finding that Ms. Pittman's condition requires her to lie down.

The ALJ found Ms. Pittman had the RFC to perform light work with the additional limitations of no driving long distances, avoidance of hazards, limits to the frequency of climbing, balancing, stooping, kneeling, crawling, hazards, and the addition of a 30 minute sit/stand option. These additional limitations are supported by the record and, accordingly, the court finds that the ALJ's assessment of Ms. Pittman's RFC is supported by substantial evidence.

## Conclusion

Because the lack of a medical opinion on residual functional capacity is not fatal and because the undersigned finds that the Administrative Law Judge's assessment of Ms. Pittman's residual functional capacity is supported by substantial evidence, IT IS ORDERED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 22) is DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 26) is GRANTED.

New Orleans, Louisiana, this 7th day of January, 2022.

_____
Janis van Meerveld
United States Magistrate Judge